Good morning, Your Honors. May it please the Court. My name is Howard Davis. I represent the Petitioner, Donna Koussa. And before I start, I'd like about two minutes for rebuttal. Sure. Watch your clock. This case involves a an immigration judge's adverse credibility finding. And in this case, there is no substantial evidence supporting the immigration judge's adverse credibility decision, particularly after he found that credible, the petitioner credible on the precipitating events. That is, that he believed that she was a Coptic Christian, she had had problems because of that, and particularly that she had an altercation with her, with a fellow employee, and then an altercation with the employee and the boss, and what followed from that conversation. Did the I.J. accept that it was for a protected ground as opposed to just sexual harassment? Well, the judge in the end could not say what the motive of the boss was. But the thing is, is that when you look at the record, if he, if the judge believed what happened, and what happened was, is that the employer, regardless of what happened initially, what happened initially, there was the fellow employee proposed marriage to her. She couldn't do it because she's a Christian, et cetera. But then the boss himself, according to her, said, accused her of defaming and insulting Islam. And that was, that was the crux of what had happened during there. Why he did that, because he wanted to protect a fellow, that's irrelevant under a case like Petroskaya. But what we have on the record here is what was said, which the judge believed. He also believed that after that, the, the employer threatened to pick up the, to call the police, and he picked up the phone. And that's where it ends. And then after that, the two officers from State Security take the Petitioner from her office there. Something, there was another witness there, corroborating witness, Mary Yakub, whose credibility the judge didn't even question at all. So we have a corroborating witness that she was taken from the office. The government's brief, one of the themes of the government's brief is that the Petitioner is putting too much of a burden on the judge in the case, and that indeed it is the, it is the alien's, the applicant's burden to, to prove the asylum case. And I have no disagreement with that. Of course, the, the alien has the ultimate burden of persuasion and the burden of production. The question is, is that this Court also has requirements of the judge of what the judge is supposed to do during the hearing itself and in the course of adjudication. And that's the crux of this case as to what happened during that time. Well, I thought that the I.J. Now, maybe I'm misreading or misrecollecting, but I thought the I.J. said, well, yes, there was the harassment, but didn't find that that rose in and of itself to the level of persecution, that it would depend on the follow-ons, the detention and all of these arrests that she was claiming. And didn't the I.J. find that her testimony on the number of arrests, she alleged, I thought in her asylum application she said she was subjected to numerous arrests, and then she testified that there was, no, there was only the one. And then she also, there was this difficulty with the date on the passport, which seemed to be quite inconsistent. So what do we do with that? I mean, the I.J. did cite a number of specific reasons why he doubted her overall credibility. Well, I would say that I don't think that the, it's, first of all, it's not, I don't think the judge, I think the judge's focus was on the credibility issue. I do not think that the judge got to the issue of whether what happened to Ms. Koussa rose to the level of persecution. She did mention that she had had past harassments. That's just part of growing up Coptic in Egypt. But in terms of what, how to characterize whether what happened to her in the main part of the claim itself, whether that rose to persecution, he didn't say, because that was, the focus of the case was the adverse credibility. Now, in terms of, you know, the discrepancies, I'd say in the record that there are no, the judge finds discrepancies where there are none. First of all, with regard to the two that I mentioned. I'm aware. I'm about to get to that. Okay. With regard to the first one, which is the main one with the arrest for the three days, the judge cites two, attempted rape versus attack. That, I mean, that is real, I mean, those are conclusions as how you name an incident. Her description of what happened to her, I mean, he didn't cite any discrepancies with regard to that. And if we're talking about what a discrepancy is, is that we're talking about something that there's no correct logical relation or it's not in agreement or harmony, it's incompatible. I mean, in her statement, she refers to the incident as both an attempted rape and an attack, and a sexual attack. Now, that's not what I'm asking about. Okay? He's going through the credibility, but there are a couple there that are pretty major. Okay. So one of them I can ask. The number of arrests, she said that she was arrested several times in the interval. Right. Okay. And did she testify that she said, no, there was only the one arrest? There were two that she testified to. One was when she was taken from the security office. The second one was when she was taken a few days after she was released from the first one from her home at night. Now, that's so she testified to two. Now, in the I-589, page 498, she refers to more. Now, I would say that in a case like Garabias, in which she testified to lesser number of times than was actually written. So that's not the issue of credibility is whether or not she's padding the case. Well, she's clearly not padding the case here. She's limiting the number of times in her own testimony that she was actually picked up. So that could not be something that goes against, you know, with regard to an adverse credibility, because that's kind of like a statement against interest. With regard to the whole password. So your rationale is that if she said there were many arrests in July in her application. Yes. But she scaled it back in her testimony, then that's a favorable inference. Yes. Because now she's disavowing her application and being more realistic about it. She's cutting down. So the issue of credibility is whether or not she's padding a claim. She's clearly not padding a claim. And it's also. What she was doing at the outset in the application. But okay. All right. So what about the passport? Well, first of all, as far as the passport. The thing with the passport is that in general, this Court accords relatively little importance with regard to how the person gets out of it. No, no, no. That's not the point. The date on the passport, she said. It says May 24th. Yeah, before any of these things. Okay. But the thing. I actually find that to be. I think that's of little significance there. Because, first of all, the issue is. What is the issue with regard to the passport? Is it a state of mind? No, no. It's a factual discrepancy between the events, as I understand it. Now, maybe, again, I don't have perfect recall on this. But my understanding is that her son had. Because of the harassment, she decides she had to leave Egypt with her son. Is that correct? Correct. And her son had to go get the passport. Correct. Because he wasn't available to do that. That's right. And it was a precipitating event were these harassments. Correct. And yet the date on the passport, as issued, was before. Yeah, but the date on the issue. And he said, I went down and my mother, I had to go down and get the passport. So how is it that he was able to get a passport with a date that predated any of the events that caused her to ask him to go get the passport? But having a passport doesn't mean that you can get out of the country. The main thing is that she got a visa on June 4th, which there is no contradiction to, which she testified to. But with regard to that, I mean, if the issue is. So is your argument that the evidence that she put in, the statements that she put in, that the passport she already had, she didn't get the passport as a result of any of the harassing events or the detentions or anything else? Is that yes or no? Well, the date is May 24th. That occurred before the actual precipitating events. But she did say that before that, she had, she was getting harassed in general at work, and but that was before the precipitating event, but she did testify that before that time she had been getting pressured at work relating to. But I thought her testimony was that she got the passport because of the events that are at issue in this particular case. But that is the harassment by her co-worker and so on. But everything is part of a, is part of a whole. She has no control over what, how a government puts a date in the passport. All right. I mean, I know I'm not, but. OK. But relatively low. That's such cool. The question like I thought I understood your position earlier. But at the end, then I wasn't sure. Is it settled that she got her passport before the rape incident and the beatings and that she made her decision to leave and got her visa after that point? Are you saying that she got the passport after those events and the government just put the wrong date on it? But what is your position? Well, she. My position is, is that she first of all, she had passports. This was not her first passport. She had passports from before that time. So as to the passport. So did did she then? I don't mean to cross examine you, but I think it's a yes or no answer. Did she have this passport before the rape event? She according to her, she did not. The first time she saw this passport was after she was released. That's what she said. That's the first time she saw this particular passport. OK, well, the record indicates. Were you counsel in this proceeding? I mean, you were the one that was representing her below. Yes. Because there was this discussion in the record about where there's a question about the passport on this date. And then she says or he says, rather, I got the passport on June 1st. But then there's an off the record colloquy. And then it comes back and nobody explains the date. So that's why I think we're at sea trying to figure out what the passport means. You don't have any explanation for that. Well, my understanding of the record is that that's when she said she first saw. And based on that, can I ask you a question? As you are now making very clear that the word saw is here. What is the date that she applied for the passport? Was it prior to the incident? Because you can apply for the passport and take some time before you actually see it. It may have been issued a week before. So I don't want to parse the words, but I want to make it clear. And I think what my colleagues are asking is when did she apply for the passport? Was it prior to the incident or was it subsequent to the incident? Not when she saw it. I can only say that she didn't. It does not seem that she herself applied for it. And I agree with the point that the passport was in her hands at that time. And the passport was in the hands of her son and others were involved in renewing it. She had this was like I said, this is not the first passport that she had. And I know that I'm not answering your question. That's true. And that's what I'm trying to get to. And because it's not clear about that, that she actually went down beforehand or at to do that. But she did not have the passport in her hands at that at that time. All this, it seemed, took place while she was in custody. And so it was in the hands of others. Okay. And I'm also going to say that the judge did not confront her. Well, we understand that. It's obvious that this didn't get flushed out of the record. Thank you. Ms. Cusa. May it please the Court. My name is Lindsay Williams and I represent the Respondent in this matter. The issue before the Court today is does the evidence in this record compel a reasonable fact finder to reach a contrary result to that of the immigration judge, which in this case would be that Ms. Cusa and her son were credible witnesses. He doesn't find her incredible about the harassment. He goes through and parses a lot of inconsistencies, including this problem with the passport. And it's very troublesome because, as you can tell from the panel's questions, that does seem a material inconsistency, at least to me it does. It would be something that I could understand the I.J. being troubled about. But there's no questioning of her to get the explanation. We're questioning counsel who wasn't even there. Were you there at the time? No, Your Honor. I was not. We got this record where they go off the record and then we don't know what the passport date significance was, what the explanation was. And yet the immigration judge hangs his hat on that in a material way. Well, Your Honor, if I may address that. I know there are other things that he cites. I'm not all that persuaded by some of the other things. Correct. And, Your Honor, the case law in this circuit is that there need only be one sufficient basis to sustain an adverse credibility finding. Let's assume that that's the one sufficient basis if it can be held up. Absolutely. And I would be happy to. Okay. Counsel. Yes. But for it to be sufficient, doesn't the Soto Olarte case and some other cases which it followed say that the IJ has to confront her with an inconsistency and give her a chance to explain so that if there is what might seem like a material issue on the passport date that we can't credit that as a basis for the adverse credibility decision if she wasn't given a chance to explain it? Yes, Your Honor. That is the correct summary of the case law in this circuit. And even applying that case law to this case, it's the Respondent's position that this is that the date the passport was obtained when compared to the testimony of Ms. Cusa and her son is a sufficient basis for the adverse credibility finding, and that Ms. Cusa's son was given an opportunity to respond to the fact that May 24th was the issue in State. And I would be happy to walk the Court through that with citations to the record. Okay. Why don't you do that? Okay. If we look at Administrative Record, page 99, and I'm going to go through and just show all of the inconsistencies that have to do with when the passport was issued. Ms. Cusa states that she was released from detention on Sunday, May 30th. Ms. Cusa later states that I got the passport, not I saw the passport, but I got the passport on Tuesday, which would have been June 2nd, and that is Administrative Record 102. Okay. She got from whom? She does not say whom. If you put together the testimony, we can assume it was from her son because her son is the only one. Right. So we don't know when he got it. Well, we do know when he got it because of his testimony. Okay. Okay. So on Administrative Record 101, she said that her son started preparing the paperwork at the beginning of the month of June from the time her brother in the United States heard what had happened to her, referring to her detention, which was supposedly May 28th through May 29th. That's an Administrative Record page 103. She makes reference to the fact that she was in bad mental condition when her son prepared the paperwork. Again, we can assume if she was in bad mental condition, that meant the paperwork for the passport was prepared after her detention. She says, I had the passport when I was detained, but it was old. So she basically, and that's on Administrative Record 101, so she basically states the passport that she had when she was in detention was her old passport from when she was 18. She says she first saw the application for the passport after she returned from detention. That's Administrative Record 104. She again references her brother telling her son to get the paperwork together after her release from her detention. The immigration judge questions her numerous times on page 99 to 100 about the exact dates of her detention, and I would presume that that would be the immigration judge making sure that the dates that she's saying she was detained, she's sticking to those dates, she's not changing them. Then we get to the son's testimony, Administrative Record page 121. Before you go to the son, before you get to the son, please, if you just go to hers, does the IJ confront her with the inconsistency in the date of her passport? No, Your Honor, because actually the way the testimony unfolds or the hearing transcript unfolds, it appears that the immigration judge had not yet, I don't know if it was that he had not yet realized that the issuance date on the passport was May 24th, but he did not bring that up until the son's testimony. Okay, well, if he never gave her a chance to explain it, why shouldn't we say that we can't count that to discredit her and that maybe you should go back and the IJ can have a full hearing, can give her a chance to state her view, and he can make a determination. Like if we were to say the determination doesn't stand up, we can do it without, we can remand on an open record under soto alarte, and if he's got good reasons after hearing her out, he can again say she's not credible. But I'm having trouble to be, just as one judge to state my concern, I'm having trouble in light of the serious story of rape and beatings with saying we just throw all that out because of an inconsistency in the date of the passport that she wasn't asked about, since I could certainly speculatively think of some ways to reconcile it, but the important person is her. Well, Your Honor, in reality, it was her son who actually filled out the application and obtained a passport for her. So in this particular instance, even though the passport was hers, it was her son that actually obtained it, and not only that, it was her son who had the conversations with her brother in the United States who was the one that allegedly came up with the idea for her to renew her passport and come to the United States. So in reality, the son's testimony is as important, if not more important, with respect to the date that the passport was obtained in comparison to the issuance date on the passport. What happened to his petition? Wasn't he a co-petitioner in this case? Yes, and I believe that he withdrew and filed his own petition. I believe that there was a footnote that I read in either. I understood that his had been remanded. It may have been remanded. I don't know that it was remanded. I think he filed a motion to reopen, but I'll have to check the procedure on that. But just because I'm running out of time, and I just want to give you these citations in the record, and then I understand. So where is he confronted to explain the date? Okay, on administrative record 130 and 131, the immigration judge shows the passport to the son and says the passport shows the issue date of May 24th. The son says, no, it was June 6th. And then he says, I mean June 1st. It was June 1st. Yes. So in that instance, had there been an explanation, then. . . I'm sorry. Where is that in the record? That is on administrative record page 130 and 131. Yeah, but then it says, no, I got the passport June 1st. But at that point, there's a colloquy. Exactly. The government attorney and counsel for the two parties go off the record. And when Nasheed tried to enter the conversation, the I.J. cut him off, saying, wait a second. No question pending right now, right? He does say that, Your Honor. Okay, there was some confusion, da-da-da, so on and so forth. Bond, coming back on the record, the I.J. stated he had no further questions and the matter was not pursued. Correct, Your Honor, but again. . . The respondent must point out that he was represented by counsel, as was. . . Counsel, wait a minute. This is. . . you. . . we all understand that, represented by counsel. But the I.J. said, I have no further questions. Okay? The I.J. introduced the issue and it says, I have no further questions. Now, I don't know what went on off record. I have no idea why counsel didn't ask a question. The judge may have said something off record. But in any event, the point is that it's the mother who is relying on her son, and you're saying that we should accept the I.J. finding her incredible when she relied on her son. Well, the. . . And so she was never given the opportunity, was she? She was given the opportunity, and because I'm running out of time. . . How? And I think this is important. No, don't worry about the time. Okay. I'd like an answer to my question. The immigration judge asked the son to walk him through the day that Mr. Poussa was released. In Ms. Poussa's testimony, she was released on a Sunday. Okay? When the immigration judge was talking to Ms. Poussa's son, he says, walk me through the day that she was released and what happened. She was released at 9 o'clock. She called her son over at her uncle's house at 905. He walked over and got to his mom's house around 10 o'clock, got the pictures for the old passport, got the pictures to renew the passport, got the application, went back to his uncle's house, filled out the application for the passport, took it over to the passport office and obtained the passport that same day, which he says is June 1st. Ms. Poussa says at one point it was actually Sunday, which would have been May 31st. Regardless, this Court has defined that with this record evidence, with a passport that was issued on May 24th, clear testimony that the passport was applied for and obtained on June 1st, numerous questions about that, numerous times that the witnesses repeat that testimony. The Court has defined that based on that, the record compels that they were telling the truth. And if the Court feels, Respondent understands the Court's position that if the immigration judge didn't give them a chance to, didn't confront them with the inconsistency and give them a chance to explain it, that it can be remanded. However, with the questioning regarding the dates, Respondent's position is they did have the opportunity. Thank you. All right. I think we've heard enough on the case. Thank you very much. The case is submitted, and thank you, counsel, for your arguments.
judges: Fisher, Gould, England